UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:19-cv-25154

Allan H. Applestein, an individual, and
Diatomite Corporation of America, a Maryland
Corporation,

JURY TRIAL DEMANDED

        Plaintiffs,

v.

Howard Kleinhendler, an individual,
Wachtel Missry LLP, a limited liability
partnership, and DOES 1 through 5,

        Defendants.
_____/

## COMPLAINT

Plaintiffs, Allan Applestein and Diatomite Corporation of America hereby file the following Complaint against defendants, Howard Kleinhendler and Wachtel Missry LLP (collectively, "Defendants"), alleging as follows:

1. Plaintiff Allan Applestein is an individual, born in 1932, who resides in Aventura, Florida. He was a member of the second graduating class of Brandeis University and then went on to graduate from Harvard Law School. He was admitted to practice law in Maryland where he practiced for only a short time before transitioning into a business career and moving to Florida. Applestein became very successful in business as an investor. Among other enterprises, he is the founder and principal of Plaintiff Diatomite Corporation of America ("DCA"). In 2015, Applestein experienced a steep decline in health and began to succumb to his age and was eventually diagnosed with Alzheimer's disease. He has undergone competency proceedings and has even been equipped with a LoJack device so that he could be found when he would get lost. Since 2015

he has had round-the-clock care: a live-in caregiver; a full-time chauffeur; and an office manager, who attend to him around-the-clock.

2.	Plaintiff DCA is a Maryland corporation with its principal place of business in Aventura, Florida. Unless otherwise stated, Applestein and DCA shall be collectively referred to throughout this Complaint as "Applestein."

3.	Defendant Howard Kleinhendler is an individual residing in Lakewood, New Jersey. He is an attorney at law and partner at Defendant Wachtel Missry LLP. He graduated from Touro College and then received his J.D. from Temple University School of Law.

4.	Defendant Wachtel Missry LLP (the "Wachtel Firm") is a limited liability partnership with its principal place of business in New York, New York. The Wachtel Firm describes itself as a law firm experienced in the fields of real estate, corporate, litigation, family law and intellectual property. At all times mentioned herein, the Wachtel Firm approved or ratified the acts of its partner and agent, Kleinhendler. At all times mentioned herein, Kleinhendler was acting as a partner of an agent for and on behalf of the Wachtel Firm.

5.	Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants and Does 1 to 5, inclusive, and each of them, were the agents, joint venturers, partners, representatives, or employees of each other and, in doing (or failing to do) the things alleged herein, were acting within the course, purpose, and scope of their agency, joint venture, partnership, representation, or employment. The acts, omissions, and conduct alleged herein of each such Defendant were known to, authorized, and ratified by each such other Defendant. Plaintiffs further allege, in the alternative, that some or each of the Defendants acted at times independently of all other Defendants to cause damage and injury to Plaintiffs.

6. Plaintiffs are presently unaware of the true names and capacities of the defendants sued herein as Does 1 through 5, inclusive, and therefore sues each of those defendants by fictitious names. Plaintiffs will seek leave to amend this complaint to allege the true name and capacity of each Doe defendant when ascertained. For convenience, all references herein to "Defendants" shall be deemed to include all fictitiously named defendants, and each of them, unless otherwise specifically alleged. Plaintiffs allege on information and belief that each Doe defendant is, in some manner, legally responsible for the acts alleged in this complaint and has proximately caused harm and injury to Plaintiffs.

7. All references hereafter to "Defendants" shall be deemed to include all Defendants, and each of them, unless otherwise specifically alleged.

## I. Jurisdiction and Venue

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of attorneys' fees and costs.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in the State of Florida. For example, Applestein resided in Dade County at all times material to this Complaint and never traveled outside of Florida and the instruments and agreements Plaintiffs executed were executed in the State of Florida. Kleinhendler traveled to Dade County numerous times during the time period alleged in the Complaint and signed the instruments and agreements at issue in this case within the State of Florida. The legal malpractice, breaches of fiduciary duties, and fraudulent transactions occurred in the State of Florida at the direction of Defendants.

10. All conditions precedent to the prosecution of this action have been satisfied,

fulfilled, extinguished, waived or otherwise executed.

## II. Factual Background

11.     In 1958, a then 26-year-old Applestein purchased approximately 1,000 acres of land in Richmond County, Virginia. The storied piece of land is known as the Fones Cliff Land ("Fones Cliff Land"). It lies within a four-mile cliff formation along the eastern side of the Rappahannock River and contains white diatomaceous earth that was formed millions of years ago.

12.     In late 2010 Applestein first engaged the Wachtel Firm and Kleinhendler as his and DCA's attorney. Applestein was already 78 at the time he engaged the Wachtel Firm. Applestein paid a one hundred-thousand dollar retainer ($100,000.00) to the Wachtel Firm on December 30, 2010. Despite starting out with a limited-scope engagement, Defendants continued rendering services as his attorney from 2010 until the spring of 2019. Applestein continued to make payments to Defendants for legal services rendered over the course of time, which totaled approximately one hundred seventy-five thousand dollars ($175,000.00).  At all times material to this Complaint, Defendants Kleinhendler and the Wachtel Firm represented and maintained an attorney-client relationship with both Alan H. Applestein, personally, and DCA.

13.     From the time the Wachtel Firm and Kleinhendler first began representing Applestein, Applestein's physical and mental condition required that he have a live-in caregiver, Edward Brooks ("Brooks"). Brooks worked around the clock to take care of Applestein. Applestein also had a full-time chauffeur, Jose Antonio Jimenez ("Jimenez"). Kleinhendler knew each of them well.

14.     Around 2013, Applestein, then 81 years old, sought to sell or develop the Fones Cliffs Land. Applestein, of course, sought the legal advice and counsel of his trusted attorneys Kleinhendler and the Wachtel Firm to handle the transaction and represent him in connection with

this effort. Defendants accepted the representation and performed services in connection with it. Various sales opportunities arose over time, including the following:

      A.    At one point, Peter M. Jarowey ("Jarowey") became interested in purchasing the Fones Cliffs Land.  Jarowey first made an offer to buy the Fones Cliffs Land in 2013 for $8.3 million. At that time Kleinhendler had come up with an idea to develop the land and convinced Applestein to pursue Kleinhendler plan and terminate the deal with Jarowey. During these discussions with Jarowey, Kleinhendler described himself to Jarowey and others as Applestein's lawyer, and Jarowey recognized Kleinhendler as Applestein's attorney and counselor in his correspondence with Applestein.

      B.    Eventually, Jarowey improved his offer to purchase the Fones Cliffs Land, increasing the purchase price to $12.5 million in cash. Kleinhendler, wanting to scuttle the deal so that he could get control of the Fones Cliffs Land, accused Jarowey of creating a fraudulent transaction in order to secure the funds necessary to complete the transaction. Kleinhendler made this accusation during a telephone conversation with Applestein and at least one other person.  Kleinhendler strongly urged Applestein to pass on the deal and was successful in dissuading Applestein from pursuing the deal with Jarowey.  Following the counsel and legal advice of his trusted lawyer, Applestein rejected Jarowey's offer of $12.5 million in cash.

      C.    Sometime later, in and about 2015, DCA entered into an agreement to sell the Fones Cliffs Land to the Chesapeake Conservancy.  However, the Chesapeake Conservancy was ultimately not able to obtain the funds necessary to complete the purchase and the deal terminated.

      D.    Further confirming that Kleinhendler was Applestein's attorney for this

matter, he made time entries in the Wachtel Firm's billing system regarding the attorney-services he rendered in connection with the sale of the Fones Cliffs Land. The Wachtel Firm even apparently re-invoiced Applestein in 2018 for the work Defendants performed in 2015. Because Applestein had already paid for the services, Kleinhendler directed the Wachtel Firm to retract the invoice.

15. Applestein's health, which had been diminishing due to the onset of Alzheimer's disease, started taking a steeper decline in 2015. Sensing that Applestein's declining health and mental condition presented an opportunity, Kleinhendler engaged in a yeoman's effort to ingratiate himself to Applestein.

16. Kleinhendler would make periodic visits to Applestein's home, nominally to keep him company. But that was a pretense, which he used to foster Applestein's trust and friendship, all the while Kleinhendler was attempting to gather information about Applestein's personal life and financial affairs.

17. In each of these visits, Kleinhendler would inquire diligently of Applestein's staff of his health condition, family relationships, and other information about Applestein's business affairs and assets. He regularly inquired of Betz Guzman ("Guzman"), who served effectively as DCA's chief operating officer and Applestein's personal business manager, of Applestein's physical and mental state of health. Kleinhendler also pumped Jimenez for information. On several occasions, Jimenez reported to Guzman that the nature of the questions Kleinhendler asked made him suspicious of his motives and intentions: "It made me very uncomfortable," Jimenez would tell Guzman, "so I told him I was just the driver and I do not know any of those things."

18. Under Kleinhendler's carefully laid plan, the idea ultimately became a formal proposal to rezone the Fones Cliffs Land submitted to the Richmond County Board of Supervisors.

That proposal originated with and was managed and controlled by Kleinhendler. The grandiose plan included a mixed-use proposal to develop the property for 718 homes and townhouses, 18 guest cottages, an 18-hole golf course, 116-room hotel, restaurant, a small commercial center, a skeet and trap range, equestrian center with stables, a 10,000 square foot community barn, and seven piers along the river.

19. Eventually, Kleinhendler made a pitch to his client that instead of selling the Fones Cliffs Land to another buyer or developing it himself, Applestein should sell it to Kleinhendler and let Kleinhendler develop it. **Kleinhendler did not advise Applestein of the inherent conflicts of interests in such a transaction**. Moreover, because of Applestein's "major neuro-cognitive disorder," as it was described by his geriatric psychiatrist, Applestein could not independently evaluate whether there were conflicts.

20. By the time of Kleinhendler's plan to acquire the Fones Cliffs Land, Kleinhendler had spent enough time with Applestein to have observed his declining health. Nevertheless, Dr. Andrea Bivens ("Bivens"), one of Applestein's daughters, had expressly warned Kleinhendler that her father's health was declining and of his diminished capacity. Applestein had once been a hyper-focused and deliberate man, but by the time Kleinhendler proposed the land development deal, Applestein did not have the mental capacity to appreciate it and he could not even sit still to partake in the discussions. Applestein seldom even spoke in the various meetings. Kleinhendler observed all of this behavior.

21. Since Kleinhendler started working for Applestein in 2010, Kleinhendler knew that Applestein was not close with his daughters and were not involved in his business dealings. Applestein was fiercely independent and would never have allowed Bivens to be involved in his business dealings. Bivens' involvement in the transaction was a significant departure from past

practices and would have been yet another clear indicator to Kleinhendler of Applestein's declining mental state.

22. Indeed, during that same time period, Dr. Marc Agronin, the Senior Vice President for Behavior Health at Miami Jewish Health who was Applestein's geriatric psychiatrist, had already advised the family to draw up powers of attorney, to assist them in managing Applestein's affairs. Kleinhendler was also aware of this because the family had to engage a family and estate planning attorney to handle that matter.

23. Robert C. Smith, ("Smith") an attorney working on the zoning aspects of the potential land-development deal, knew that Kleinhendler was angling to acquire the property while he was also acting as elderly Applestein's lawyer: "[t]hroughout the zoning process, my contact with Diatomite was mostly conducted through Howard Kleinhendler, a New York Lawyer, who also represented Diatomite and its owner, Alan [sic] Applestein." Declaration of Robert C. Smith at ¶ 29, In re: Virginia True Corporation Case No. CL19-42769 (Bankr Ct ED NY 2019).  (A true and correct copy of Smith's declaration is attached hereto as **Exhibit A)**  What is more, Smith advised and discussed the conflicts of interests with Kleinhendler that were raised by his attempt to acquire the Fones Cliffs Land from his elderly client, but Kleinhendler disregarded Smith's warnings.

24. A Florida attorney, Marian L. Hasty ("Hasty"), was engaged on March 21, 2016, to handle certain estate planning matters for Applestein, and she communicated with Kleinhendler leading up to the purchase of the Fones Cliffs Land.  Applestein advised Hasty that Kleinhendler was his lawyer in connection with the Fones Cliffs Land.  She also learned directly from Kleinhendler that he was Applestein's lawyer generally and specifically in connection with the sale of the Fones Cliffs Land. (A true and correct copy of Hasty's affidavit is attached as **Exhibit**

**B)**

25. Despite all this, Kleinhendler proceeded with his plan to acquire the Fones Cliffs Land from Applestein. He cared not at all that he was still Applestein's lawyer. On the contrary, he abused that relationship of trust putting his self-interest above his ethical duties to his client, ultimately at great cost to his client. Kleinhendler could have terminated the attorney-client relationship but did not.

26. Kleinhendler held himself out to Applestein and others as Applestein's lawyer, corresponded through the Wachtel Firm e-mail address, and used the Wachtel Firm signature block on all his emails. He did not even disclose the conflicts of interest to the elderly Applestein or seek to secure a waiver through informed consent, if this conflict was even waivable in the first place.

27. Kleinhendler's actions and conduct evidenced that he cared not at all about Applestein's age and diminished mental capacity. On the contrary, Kleinhendler used his client's condition to aid him in his quest to take advantage of Applestein.

28. Kleinhendler's plan culminated in the spring of 2017. Kleinhendler organized an entity—Virginia True Corporation ("Virginia True") to purchase the property. Kleinhendler also structured the financing for deal, and drafted all the documents, all the while continuing to represent Applestein. At one point, he confirmed his continuing legal representation of Applestein telling Bivens: "I love your dad. I am his attorney."

29. Kleinhendler ultimately advised his client that the deal should be structured as a seller-financed transaction. Applestein would receive a cash payment of $5 million at closing and finance the remaining balance of $7 million through a loan to be evidenced by an unsecured promissory note.

30. According to Dr. Agronin, by 2017 Applestein's condition had diminished so significantly that "any lay person would have seen his impairment." Yet, Kleinhendler further persuaded his elderly and infirm client that there was no need to obtain a lien or purchase money security interest in the Fones Cliffs Land as collateral for the loan. When asked (on more than one occasion) by Bivens and other Applestein representatives about a mortgage against the property to secure the repayment of the amount due, Kleinhendler specifically and repeatedly advised his client that a lien on the Fones Cliffs Land was unnecessary and would make the planned development of the land more difficult.

31. Kleinhendler tried to further justify the lack of security by crafting a nonsensical provision in the contract of purchase and sale that seemed to require that any mortgage given by a golf course developer would be transferred to Applestein or otherwise used to pay down the purchase money promissory note. The provision is nonsensical. Any subsequent mortgage on the land is not an asset of Kleinhendler or Virginia True that could be "applied" against the promissory note. Yet Kleinhendler passed this off to his client advising and representing to him that it was a mechanism that would be for Applestein's protection and would provide him with security for the repayment of the amount due.

32. Based on false, conflicted, and misleading legal advice and counsel, Kleinhendler was able to close a deal to have Virginia True acquire the Fones Cliffs Land, but not without a last-minute promise that Applestein's family was able to secure from Kleinhendler. Kleinhendler made an express promise, via a "side letter," not to encumber the Fones Cliffs Land without Applestein's prior approval.

33. Kleinhendler traveled to Florida to have the contract for sale, promissory note, the side letter and other necessary transaction documents signed by Applestein. He even went to lunch

with Guzman, Brooks, and Jimenez, where they all witnessed Applestein's patent inability to feed himself, wipe his face, or concentrate for any length of time, or otherwise conduct legal or financial business. Kleinhendler still went forward with the deal and, on April 27, 2017, accepted the papers signed by his elderly, infirm, and unaware client—the same client he expressed his love for.

34. At the time of closing, Kleinhendler also persuaded Applestein to lend him five hundred thousand dollars ($500,000.00) (the "Kleinhendler Loan"). The loan was evidenced by a five hundred thousand dollar ($500,000.00) promissory note executed by HK Consulting Group, LLC, a New Jersey limited liability company that operates from Kleinhendler's home address. No security was given for the loan and Kleinhendler did not guarantee its repayment. Kleinhendler and the Wachtel Firm represented Applestein in connection with the making and documentation associated with the five hundred thousand dollar ($500,000.00) Kleinhendler Loan.

35. The family representatives felt some relief after having obtained the assurances of Kleinhendler that the side letter provided Applestein with meaningful and adequate protection for the payment of the loans. Kleinhendler, however, never intended to live up to his promise not to encumber the Fones Cliffs Land without Applestein's approval.

36. On the very same day that Kleinhendler was executing the deal with his and the Wachtel Firm's client to acquire the Fones Cliffs Land, promising to never encumber the land without Applestein's prior approval, he was signing a conflicting agreement with two investors of Virginia True. Unbeknownst to Applestein, Kleinhendler entered into a deal with these investors in which he purported to allow them to impose a lien upon the property and leave Applestein with no contractual protection or security for the recovery of the amount of the loans.

37. Kleinhendler's investors in Virginia True, Domenick and Anthony Cipollone (the "Cipollones") had agreed to pay $5 million in cash as an equity investment in Virginia True and

entered a Stockholder's Agreement on April 27, 2017 (the "Stockholder's Agreement'). (A true and correct copy of the Stockholder's Agreement is attached as **Exhibit C**) The Cipollones agreed to purchase thirty two percent (32%) of the stock of Virginia True for their $5 million cash payment.

38. Kleinhendler never disclosed the Stockholders Agreement to Applestein and never told him about the Cipollones, any other investors or financiers that he had, or even whether he had any other financiers or investors. On information and belief, the Cipollones were informed by Kleinhendler that Kleinhendler was the attorney for Applestein representing Applestein, DCA, and the Fones Cliffs Land.

39. Neither Applestein (nor any of his caretakers) knew at the time, that the Stockholder's Agreement purported to provide the Cipollones the right to convert their $5 million equity investment in Virginia True into debt and encumber the sole tangible asset of Virginia True—the Fones Cliffs Land—with a mortgage if they did not receive a return of their capital investment within 18 months.

40. The Cipollones demanded a return of their capital from Virginia True. After numerous demands by the Cipollones and the filing of a lawsuit, Kleinhendler caused Virginia True to execute a deed of trust in favor of the Cipollones. On December 12, 2018, the deed of Trust was recorded. (A true and correct copy of the Deed of Trust is attached as **Exhibit D**)

41. Despite his promises to the contrary, Kleinhendler facilitated and consented to the recording of a mortgage against the Fones Cliffs Land. Despite his advice and recommendation that a mortgage was unnecessary and that Applestein's security derived through other mechanisms, Applestein was not protected.

42. The situation was so terrible, Robert Smith observed: "Sometime after closing and

after I had withdrawn from representing Virginia True due to Kleinhendler and Fernandez's dishonesty and misrepresentations, I began to wonder if Kleinhendler had taken advantage of Mr. Applestein" Exhibit A at ¶ 31.

### **COUNT I: LEGAL MALPRACTICE**
(Against all Defendants)

43. Plaintiffs re-allege and incorporate paragraphs 1 through 42, as if fully set forth herein.

44. At all material times, there was an attorney-client relationship between Defendants and Plaintiffs.

45. Defendants failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community.

46. Defendants failed to inform Plaintiffs of the inherent conflicts of interest because Defendants' interests were adverse to theirs.

47. As a direct and proximate result of Defendants' acts and omissions, Applestein has and will continue to incur such damages, in an amount to be determined according to proof at trial, but at least in excess of $7,724,200.36.

48. But for Defendants' negligence, Applestein would not have suffered the damages he has suffered.

### **COUNT II: LEGAL MALPRACTICE**
(Against all Defendants)

49. Plaintiffs re-allege and incorporate paragraphs 1 through 42, as if fully set forth herein.

50. At all material times, there was an attorney-client relationship between Defendants and Plaintiffs.

51. Defendants failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community.

52. Defendants failed to advise Applestein of the prudence of having a mortgage, deed of trust, or other form of security to secure payment of the purchase price in the seller-financed transaction.

53. Defendants negligently advised Applestein that a mortgage, deed of trust, or other form of security to secure payment of the purchase price in the seller-financed transaction could not be provided because of the type of development project Defendants were contemplating.

54. As a direct and proximate result of Defendants' acts and omissions, Applestein has and will continue to incur such damages, in an amount to be determined according to proof at trial, but at least in excess of $7,724,200.36.

55. But for Defendants' negligence, Applestein would not have suffered the damages he has suffered.

## COUNT III: BREACH OF FIDUCIARY DUTY
(Against all Defendants)

56. Plaintiffs re-allege and incorporate paragraphs 1 through 42, as if fully set forth herein.

57. Defendants have a fiduciary relationship with Plaintiffs through Kleinhendler, who held himself out to be and was Plaintiffs' lawyer.

58. The Wachtel Firm and Kleinhendler breached their fiduciary duties when Kleinhendler acted against the best interests of Plaintiffs, gave no regard to protect his clients' interests, and encouraged Plaintiffs to agree to a risky and less favorable deal than had been previously offered.

59. Defendants breached their duties of care, loyalty candor, rectitude, and good faith

to Plaintiffs by negotiating and entering a transaction where Defendants' interests were adverse to Plaintiffs.

60. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have and will continue to incur such damages, in an amount to be determined according to proof at trial, but at least in excess of $7,724,200.36.

61. The acts and conduct of Defendants constitute a breach of fiduciary duties owed to Plaintiffs and were oppressive, fraudulent, and malicious. Defendants did not act in good faith with a view to the best interests of Plaintiffs. By their conduct as specified above, Defendants acted in bad faith and breached their fiduciary duties to Plaintiffs. Applestein, therefore, seeks an award of punitive damages.

### COUNT IV: ELDER ABUSE
(Against all Defendants)

62. Plaintiffs re-allege and incorporate paragraphs 1 through 42, as if fully set forth herein.

63. Defendants committed elder abuse under Florida Statutes sections 415.1111 and 825.103. At all material times, Applestein was a vulnerable adult.

64. Defendants stood in Applestein's trust and confidence.

65. Defendants exploited Applestein by knowingly deceiving him for the purpose of obtaining the Fones Cliffs Land with the intent to deprive Applestein of the use, benefit, value, or possession of the Fones Cliffs Land.

66. Defendants also knew or should have known that Applestein lacked the capacity to consent to Defendants' plan to obtain the Fones Cliffs Land with the intent to deprive Applestein of the use, benefit, value, or possession of the Fones Cliffs Land.

67. As set forth above, Defendants breached fiduciary duties that they owned to

Applestein.

68. As a direct and proximate result of Defendants' exploitation of a vulnerable adult, Applestein has and will continue to incur such damages, in an amount to be determined according to proof at trial, but at least in excess of $7,724,200.36.

69. In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Applestein is entitled to an award of punitive damages.

### COUNT V: FRAUD
(Against all Defendants)

70. Plaintiffs re-allege and incorporate paragraphs 1 through 42, as if fully set forth herein.

71. Defendants committed both common law fraud and statutory fraud under Florida Statutes sections 812.012-037 and 772. Defendants deceived and defrauded Plaintiffs through false representations, concealment, and non-disclosure during the performance of the acts described herein and in failing to perform the acts described herein.

72. Defendants falsely stated numerous material facts to Applestein and his caretakers. Namely, Kleinhendler specifically represented that Plaintiffs did not need to receive security interest when selling the Fones Cliffs Land, he specifically represented that Plaintiffs could not have a security interest in the Fones Cliffs Land because of the nature of the proposed development project; and Kleinhendler specifically represented that he would not permit any lien or other encumbrance to be voluntarily placed upon the Fones Cliffs Land without the prior consent and approval of Applestein even in the absence of a security agreement. None of those representations was true. Kleinhendler also specifically stated that the Jarowey deal was fraudulent, when in fact, it was not.

73. Kleinhendler also failed to disclose material facts that he had an obligation to

disclose. For example, he failed to disclose that the $5 million down payment against the purchase price was supplied through an equity investment into Virginia True, when in fact it was purported to be equity convertible to debt on a fixed schedule.

74. Defendants knew the above representations were false at the time they were made.

75. It was Defendants' intent to deceive and defraud Plaintiffs in order to induce his reliance upon the misrepresentations that Defendants made with the express purpose of inducing Plaintiffs to sell Virginia True the Fones Cliffs Land.

76. Plaintiffs reasonably relied upon Defendants' misrepresentations to his detriment and damage.

77. As a direct and proximate result of Defendants fraud, Plaintiffs have and will continue to incur such damages, in an amount to be determined according to proof at trial, but at least in excess of $7,724,200.36. In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Plaintiffs are entitled to an award of punitive damages.

### COUNT VI: UNJUST ENRICHMENT
(Against all Kleinhendler and DOES 1 through 5)

78. Plaintiffs re-allege and incorporate paragraphs 1 through 42, as if fully set forth herein.

79. Defendants received a benefit at Plaintiffs' expense when Plaintiffs provided them five hundred thousand dollars ($500,000.00) as part of the Kleinhendler Loan and in connection with the execution of the sale of the Fones Cliffs Land.

80. Specifically, these Defendants received the benefit of being able to use the loan proceeds.

81. Defendants unjustly enriched themselves by wrongfully converting, taking, and using the Kleinhendler Loan.

82. However, Plaintiffs did not receive any reciprocal benefit, and Defendants have refused to repay it, despite demands for repayment.

83. Therefore, Defendants have unjustly retained the benefit of the Kleinhendler Loan and equity dictates that Plaintiffs should be awarded restitution in an amount in excess of $300,000, the exact amount to be proven at trial, arising out of Defendants' unjust enrichment.

**COUNT VII: CONVERSION**
(Against all Kleinhendler and DOES 1 through 5)

84. Plaintiffs re-allege and incorporate paragraphs 1 through 42, as if fully set forth herein.

85. On or about April 27, 2017, Plaintiffs provided five hundred thousand dollars ($500,000.00) to Kleinhendler and Does 1 through 5 under the Kleinhendler Loan.

86. The Kleinhendler Loan is in default as alleged herein.

87. Plaintiffs made a demand to Defendants to repay the Kleinhendler Loan, but Defendants have failed and refused to repay the loan.

88. As a proximate result of Defendants' conversion, Plaintiffs have suffered damages in the principal sum of five hundred thousand dollar ($500,000.00), which are the natural, reasonable, and proximate results of the conversion.

89. Between the time of Defendants' conversion of the above-mentioned property and filing of this action, Plaintiffs have expended an amount to be determined at trial in pursuit of the converted property, all to Plaintiffs' further damages.

90. Defendants' acts alleged above were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of punitive damages.

### III. Prayer for Relief

**WHEREFORE**, Applestein respectfully prays as follows:

1. for compensatory damages in an amount according to proof at trial but in excess of $7,724,200.36;

2. for punitive damages, as the Court deems reasonable and appropriate;

3. for a restitution for the Kleinhendler Loan;

4. for the imposition of a constructive trust over all assets of Defendants;

5. for costs of suit herein; and

6. for such other and further relief as this Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiffs respectfully demand a trial by jury on all claims and issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 13, 2019
       Miami, Florida

Respectfully submitted,

| | |
|---|---|
| **PRYOR CASHMAN LLP** <br> *Attorneys for Plaintiffs* <br> 201 South Biscayne Boulevard, Suite 2700 <br> Miami, Florida 33131 <br> Telephone: (786) 582-3010 <br> Facsimile:  (786) 582-3004 <br><br> By: s/ *James G. Sammataro* <br> James G. Sammataro <br> Florida Bar No. 520292 <br> jsammataro@pryorcashman.com | **PRYOR CASHMAN LLP** <br> *Attorneys for Plaintiffs* <br> 1801 Century Park East, <br> Los Angeles, California 90067 <br> Telephone: 310-683-6900 <br> Facsimile: 310-943-3397 <br><br> Thomas H. Vidal, Esq. <br> (*pro hac vice* application forthcoming) <br> tvidal@pryorcashman.com <br> Benjamin S. Akley, Esq. <br> (*pro hac vice* application forthcoming) <br> bakley@pryorcashman.com |